**STATE of Missouri, Respondent,**

v.

**Kim F. COURTNEY, Appellant.**

**No. WD 61163.**

Missouri Court of Appeals,
Western District.

April 15, 2003.

Irene C. Karns, Assistant State Public Defender, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Dora Fichter, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before THOMAS H. NEWTON, P.J., ROBERT G. ULRICH and EDWIN H. SMITH, JJ.

THOMAS H. NEWTON, Judge.

Mr. Kim Courtney was convicted by a jury and sentenced to five years in prison for possession of a controlled substance, methamphetamine, in violation of section 195.202, RSMo 2000. Prior to trial, the trial court overruled Mr. Courtney's motion to suppress evidence of the methamphetamine and statements made to the police after his arrest. He argues that the evidence obtained by the police was the fruit of an illegal search under the state and federal constitutions. We reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

After James Wilmore's girlfriend reported him missing, Andrew County Sheriff Gary Howard began searching for him. Sheriff Howard identified Mr. Courtney as the last person to be seen with Mr. Wilmore and learned that Mr. Courtney might be at the Holt County home of Mr. Courtney's friend, Larry Pierce. Sheriff Howard went to the Pierce residence, where

Holt County Sheriff, Terry Edwards, later joined him. There the two sheriffs found Mr. Courtney's car, but no sign of Mr. Courtney or Mr. Wilmore.[1] When Sheriff Howard asked where he might find Mr. Courtney and Mr. Wilmore, Mr. Pierce replied that they were "around here somewhere." But Sheriff Howard could not find them and believed that Mr. Courtney was hiding. After Mr. Pierce refused permission to search his home without a warrant, the two Sheriffs left the property and withdrew to a location down the road and out of sight to wait for Mr. Courtney.

Some time later, the Sheriffs saw Mr. Courtney driving alone down the middle of the road toward them. Sheriff Howard stopped Mr. Courtney and asked why Mr. Courtney was hiding from them. Mr. Courtney explained that he had been mushroom hunting and identified a plowed cornfield as the hunting grounds. Believing that Mr. Courtney was acting "different" and noticing that he appeared sleepy, Sheriff Howard asked Mr. Courtney if he had any drugs or weapons in his car. Mr. Courtney denied having any of those items. Sheriff Howard did not detect the odor of any intoxicants.

During the stop, Sheriff Howard saw a suitcase in the backseat of Mr. Courtney's car. Sheriff Edwards also saw Mr. Courtney fidgeting with something underneath his leg. Thinking that the suitcase might have some connection to Mr. Wilmore, Sheriff Howard asked Mr. Courtney about it. At that point, Mr. Courtney started to get out of the car.[2] As he stepped out, a silver-colored bolt approximately one-and-one-half inches long and one inch in diameter fell to the ground. Sheriff Howard

picked it up, and when he felt it, he realized that it was abnormally light for a bolt of its size.

Further, Sheriff Howard twisted the top off, and it revealed a hollowed-out interior. Sheriff Howard conceded that he did not have Mr. Courtney's permission to remove the cap from the bolt. Inside the bolt, Sheriff Howard discovered a plastic bag containing what he believed to be a drug of some kind. Mr. Courtney admitted that the bag was his and that it contained methamphetamine. Later analysis confirmed that the bag contained 0.28 grams of powdered methamphetamine.

Mr. Courtney raises one point on appeal. He contends that the trial court should have excluded the methamphetamine and his statements relating to it from trial because this evidence was the fruit of an illegal warrantless search. He contends that none of the exceptions to the warrant requirement was present when Sheriff Howard searched the bolt.

## II. Standard of Review

When reviewing the trial court's denial of a motion to suppress, we must determine whether sufficient evidence exists to sustain the trial court's findings. *State v. Ricketts,* 981 S.W.2d 657, 659 (Mo. App. W.D.1998). To determine whether sufficient evidence exists, we may consider the record made at the pre-trial hearing and the record made at trial. *State v. Woolfolk,* 3 S.W.3d 823, 828 (Mo.App. W.D. 1999). We will reverse only if the trial court's judgment is clearly erroneous. *Id.* "[I]f the trial court's ruling is plausible in light of the record viewed in its entirety," we will not reverse even if we are con-

---

1. The record does not reveal whether the police ever located Mr. Wilmore.

2. Sheriff Howard surmised that Mr. Courtney may have started to get out of the car so that

he could show the suitcase to the sheriffs. In any event, he did not recall Mr. Courtney's response to his question about the suitcase.

vinced that we would have weighed the evidence differently had we been the trier of fact. *State v. Milliorn*, 794 S.W.2d 181, 184 (Mo. banc 1990).

■ Whether the State has violated the Fourth Amendment is a separate question of law, however, and one which we review *de novo*. *Ricketts*, 981 S.W.2d at 659.

### III. LEGAL ANALYSIS

■ The Fourth Amendment to the United States Constitution guarantees to the people the right to be free from unreasonable searches and seizures. U.S. CONST. amend. IV. So too does the Missouri Constitution. MO. CONST. art. I, § 15. These corresponding guarantees are coextensive. *State v. Rushing*, 935 S.W.2d 30, 34 (Mo. banc 1996).

■ Absent some well-established exception, the Fourth Amendment prohibits warrantless searches and seizures; as a general rule such searches and seizures are presumptively invalid. *State v. Gantt*, 87 S.W.3d 330, 332–33 (Mo.App. W.D. 2002).

Because the Fourth Amendment only protects a person's legitimate expectations of privacy, we must initially consider whether Mr. Courtney had an expectation of privacy in the contents of his bolt. *See, e.g., Oliver v. United States*, 466 U.S. 170, 177, 104 S.Ct. 1735, 1740–41, 80 L.Ed.2d 214 (1984) (touchstone of Fourth Amendment analysis is whether a person has a reasonable expectation of privacy). We conclude that he did.

### A. Mr. Courtney Had a Subjective and Objectively Reasonable Expectation of Privacy in the Contents of the Bolt

■ To enjoy Fourth Amendment protection, an individual must have a subjective expectation of privacy and that expectation must be objectively reasonable. *State v. Looney*, 911 S.W.2d 642, 644 (Mo. App. S.D.1995). "An individual may have a legitimate expectation of privacy in personal items regardless of location." *Id.*

In this case, Mr. Courtney undoubtedly had a subjective expectation of privacy in the contents of the hollowed-out bolt. By concealing the methamphetamine from plain view inside of the bolt, he demonstrated an intent to keep the contents hidden.

■ Mr. Courtney's expectation of privacy also was objectively reasonable. "[T]he Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." *United States v. Ross*, 456 U.S. 798, 822–23, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982). When a defendant stores drugs in a closed, opaque container that conceals the contraband from plain view, he can demonstrate an objectively reasonable expectation of privacy. *Looney*, 911 S.W.2d at 644; *State v. Oberg*, 602 S.W.2d 948, 954–55 (Mo.App. W.D.1980) (recognizing legitimate expectation of privacy in sealed containers whose outward appearance did not convey presence of marijuana hidden inside).

This court's Southern District addressed a very similar situation in *Looney*. In that case, the defendant was canoeing on a river when his canoe overturned, allowing several cellophane bags to float away. *Looney*, 911 S.W.2d. at 643. Nearby police officers recovered the bags, one of which contained an opaque film canister concealing the presence of LSD. *Id.* Armed with a suspicion that the film canister contained drugs but not with a search warrant, the officers opened the canister anyway. *Id.* Rejecting the State's contention that the canoeist effectively abandoned the container when it inadvertently

floated away, the court held that he retained a reasonable expectation of privacy in the contents of the closed film canister. *Id.* at 644–45.

Like the canoeist in *Looney,* Mr. Courtney also retained an objectively reasonable expectation of privacy in the contents of his closed container. By inadvertently dropping the bolt on the ground, where Sheriff Howard could retrieve it, he did not abandon his property or thereby relinquish his expectation of privacy in it. *See Id.*

We find unpersuasive the State's attempt to distinguish *Looney* on the ground that a bolt—unlike a film canister—is not typically used as a container to store items. It is true that "some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance." *Arkansas v. Sanders,* 442 U.S. 753, 764 n. 13, 99 S.Ct. 2586, 2593, 61 L.Ed.2d 235 (1979), overruled on other grounds by *California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). But nothing about the "outward appearance" of Mr. Courtney's bolt betrayed its contents, as burglar tools or a gun case might.

Absent any outward appearance that would telegraph the contents of the container, the container's nature and quality should not undermine its constitutional protection. As the United States Supreme Court said in *Ross:*

> For just as the most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion, so also may a traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf claim an equal right to conceal his possessions from official inspection

as the sophisticated executive with the locked attach case.

*Ross,* 456 U.S. at 822, 102 S.Ct. at 2171 (footnote omitted). *See also People v. Casias,* 193 Colo. 66, 563 P.2d 926, 930, 934 (1977) (recognizing expectation of privacy in contents of tinfoil packets commonly used to conceal drugs).

What distinguishes Mr. Courtney's case from the cases cited by the State is the lack of potential public access to his makeshift container. In all of the cases cited by the State, the defendants placed contraband outside of their exclusive control, in areas where others potentially could access it. *Cf. United States v. Sarda–Villa,* 760 F.2d 1232, 1236–37 (11th Cir.1985) (ship's crewmembers had no expectation of privacy regarding contraband stored in ship's hidden fuel compartments, an area where they could not exclude others, including the Customs Officers); *United States v. Marrero,* 644 F.Supp. 570, 575 (S.D.Fla. 1986) (ship's crewmembers had no legitimate expectation of privacy in common areas of ship where they concealed aluminum containers holding cocaine; they could not restrict access and Coast Guard could search such areas without permission); *United States v. Mehra,* 824 F.2d 297, 298–99 (4th Cir.1987) (importers had no expectation of privacy in packets of hashish concealed in a roll of Indian cotton, where the cotton had left their exclusive control for processing by third-party finishing company).

Under the circumstances present in all of those cases, any expectation of privacy was therefore unreasonable, given the defendants' limited ability to exclude others. *Cf. State v. Mosby,* 94 S.W.3d 410, 416 (Mo.App. W.D.2003) (recognizing that no reasonable expectation of privacy exists where the public at large is welcome). By contrast, Mr. Courtney kept contraband on his body and within his exclusive control.

Since Mr. Courtney had a legitimate expectation of privacy in the bolt, the State had the burden to justify a warrantless search and to show that the search fell within an exception to the warrant requirement. *State v. Burkhardt,* 795 S.W.2d 399, 404 (Mo. banc 1990). The only potential exceptions identified here are the so-called *Terry* stop and the plain view/plain feel doctrine. *Gantt,* 87 S.W.3d at 333 (recognizing these exceptions to the warrant requirement).

The State asserts that Sheriff Howard properly stopped Mr. Courtney to investigate the Wilmore case, that the bolt appeared in plain view when Mr. Courtney dropped it, and that the contents of the bolt appeared in plain view when Sheriff Howard retrieved the bolt and inadvertently removed the cap while examining it. The State concludes that Sheriff Howard never actually searched the bolt, obviating the need for a warrant. We disagree.

**B. Sheriff Howard Properly Stopped Mr. Courtney for Investigation But He Had No Justification to Search the Contents of the Bolt in Connection with that Stop**

Mr. Courtney does not challenge the premise that Sheriff Howard properly stopped him initially to investigate the Wilmore disappearance. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under the *Terry* "stop and frisk" rule, the police may stop a person briefly without probable cause when the police identify specific and articulable facts leading to a reasonable suspicion that criminal activity is afoot. *Rushing,* 935 S.W.2d at 32. Such a brief stop gives the police an opportunity to confirm or dispel their suspicion. *State v. West,* 58 S.W.3d 563, 569 (Mo.App. W.D.2001). "The scope of such a stop ... must be reasonably related 'to the circumstances

which justified the interference in the first place.' " *State v. Miller,* 894 S.W.2d 649, 651 n. 1 (Mo. banc 1995) (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879).

Precisely because a *Terry* stop has a limited scope, the police have a correspondingly limited authority to conduct searches during such a stop. Accordingly, they may not search beyond what is necessary to protect themselves from harm. *See Id.* at 651–52 (during such stop of a motor vehicle, police may search car, limited to areas where weapons may be placed or hidden). " 'The purpose of this limited search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence.' " *Rushing,* 935 S.W.2d at 32 (quoting *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972)).

In this case, the police identified specific and articulable facts to justify the initial stop of Mr. Courtney's car. Mr. Courtney was the last person seen with James Wilmore before he disappeared and Mr. Courtney appeared to be hiding when the law enforcement officers were looking for him at the Pierce residence. These facts created a "reasonable suspicion" that Mr. Courtney might be involved in the Wilmore disappearance and justified a brief stop to confirm or dispel that suspicion.

When the bolt fell from Mr. Courtney's person after he got out of the car, that event could have created "a new factual predicate for reasonable suspicion," allowing Sheriff Howard to refocus the investigation and justifying further questioning either to confirm or dispel the newly-raised suspicion. *Gantt,* 87 S.W.3d at 333.

But Sheriff Howard had no justification for searching the contents of the bolt in connection with this investigation. A rea-

sonably prudent officer in Sheriff Howard's position would not have believed that the bolt threatened his safety or the safety of others. *See, e.g., State v. Hensley,* 770 S.W.2d 730, 735–36 (Mo.App. S.D.1989) (where officers frisked defendants during investigative stop and concluded that canister and vial felt during frisks were not weapons, officers conducted illegal search when they removed the items and then opened them); *State v. Leavitt,* 993 S.W.2d 557, 561–63 (Mo.App. W.D.1999) (during traffic stop, officer improperly opened woman's makeup case, revealing methamphetamine inside, where officer knew that the makeup case was not a weapon and where he was not concerned for his safety); *State v. Hutchinson,* 796 S.W.2d 100, 107–09 (Mo.App. S.D.1990) (*Terry* doctrine did not justify opening lip balm container concealing methamphetamine where police officer had no concern that container was a weapon). *Cf. State v. Harrison,* 957 S.W.2d 774, 777–78 (Mo.App. S.D.1997) (officer was justified in examining contents of closed container during *Terry* stop to determine if they posed a threat to safety where officer could not identify mysterious container and felt that it posed a such a threat).

Like the officers in *Hensley, Leavitt* and *Hutchinson* and unlike the officer in *Harrison,* Sheriff Howard conceded that he did not have any concern that the bolt was a weapon or that it threatened anyone's safety. As the following testimony demonstrates, he simply found it curious:

Q: And you didn't have a safety concern about it being a weapon or containing a weapon did you?

A: No.

Q: Basically you were just curious about it's [sic] lightweight?

A: Right.

Because Sheriff Howard could not (and did not) reasonably believe that the bolt threatened his safety or the safety of others, he was not justified in opening it during the investigative stop.

## C. The Bolt Was in Plain View, But its Contents Were Not

■■■■■■ Although the law limits searches during an investigative stop, it does not demand that the police turn a blind eye to evidence discovered in plain view or by plain feel during such a stop. Thus, a further exception to the warrant requirement arises when the police discover contraband in plain view or by plain feel.[3] For this exception to apply, three conditions must exist: (1) the police must comply with the Fourth Amendment in arriving at the place from which the evidence can be plainly viewed; (2) the police must have a lawful right of access to the evidence itself; and (3) the incriminating character of the evidence seized must be "immediately apparent." *Gantt,* 87 S.W.3d at 333 (citing *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)). The United States Supreme Court "has equated the requirement that an item in plain view or feel be 'immediately apparent' as contraband or other evidence of a crime with the probable cause standard." *Rushing,* 935 S.W.2d at 33. "Thus, to justify a seizure under the plain-feel doctrine, the officer must

---

**3.** Although the plain view doctrine differs from the reasonable expectation of privacy concept discussed in section III(A) above, the alert reader will discern some overlap between the two. To the extent that a defendant exposes an item to plain view or plain feel, he may weaken any claim to have a reasonable expectation of privacy in the item. *See* William A. Knox, 19 Mo. Practice: Criminal Practice and Procedure § 53 at 98 (2d ed. 1995).

have probable cause to believe that the item felt is contraband." *Id.*

 In this case, the bolt fell from Mr. Courtney's person in an area where Sheriff Howard rightfully viewed it. However, the contents of the bolt remained hidden from view, and nothing about the character of the bolt made it "immediately apparent" that the bolt concealed contraband inside. It looked just like any other bolt. Although Sheriff Howard sensed that the bolt was abnormally light when he picked it up, this fact alone did not make it "immediately apparent" that the bolt contained drugs, let alone any other items. *Cf. Gantt,* 87 S.W.3d at 334–35 ("Once the bag was out of Gantt's pants, in full view, Skinrood could see its contents through the clear plastic. He saw 11 white, rock-like balls wrapped in individual packages. He asked Gantt what the balls inside the bag were, and Gantt admitted that they were crack cocaine. Hence, the bag's contents were in plain view, and the state was, therefore, not obligated to obtain a search warrant of the bag's contents as it may have been had the bag not been clear."); *Mosby,* 94 S.W.3d. at 419 n. 6 (officer was entitled under plain view doctrine to seize clear plastic bags containing beige, rock-like substance).

The record in this case contains no evidence that Sheriff Howard knew from experience that criminals commonly use hollowed-out bolts to store illegal drugs or other contraband. *Cf. Rushing,* 935 S.W.2d at 33 (officer testified that because of his training and experience, he knew that the type of container that he felt was frequently used to carry cocaine). Accordingly, the plain view/feel exception does not apply here unless the contents of the bolt revealed themselves by plain view or plain feel.

### D. The Evidence Does Not Support the Argument that Sheriff Howard Discovered the Contents of the Bolt in Plain View

 Although the State concedes that Sheriff Howard removed the top of the bolt and peered inside without obtaining a warrant, the State maintains that he did so accidentally when the top of the bolt came off in his hands. The State reasons that Sheriff Howard never actually searched the bolt because the contents of the bolt appeared in plain view after the cap came off.

The problem for the State is that the record simply does not support the argument that the cap just came off in Sheriff Howard's hands. At the suppression hearing, Sheriff Howard testified that he "*twisted* the bolt and the cap of it came off." (emphasis added). He further testified:

A. I just turned it. I just thought it was a bolt. I just twisted and it came off in my hand.

Q: You did twist the top off?

A: Oh, yeah.

At trial, Sheriff Howard likewise testified: "I *twisted* the cap on it and it came off." (emphasis added). He conceded that he did not have Mr. Courtney's permission to twist off the top of the cap. This testimony belies the State's argument that Sheriff Howard did not search the contents of the bolt.[4]

### E. Probable Cause Alone Does Not Justify the Warrantless Search of the Bolt

 Finally, we disagree with the State that the warrantless search can be

---

4. Sheriff Edwards also submitted an affidavit in this case, in which he said that "Sheriff Howard picked it up and twisted the top."

justified on the basis of probable cause alone. "Even when government agents may lawfully seize ... a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package." *United States v. Jacobsen*, 466 U.S. 109, 114, 104 S.Ct. 1652, 1657, 80 L.Ed.2d 85 (1984). The seizure of an item "does not compromise the interest in preserving the privacy of its contents because it may only be opened pursuant to either a search warrant ... or one of the well-delineated exceptions to the warrant requirement." *Horton v. California*, 496 U.S. 128, 141 n. 11, 110 S.Ct. 2301, 2310, 110 L.Ed.2d 112 (1990). By itself, the existence of probable cause does not justify the warrantless search of a closed container. *Oberg*, 602 S.W.2d at 952. *See also Leavitt*, 993 S.W.2d at 560, 562 (rejecting argument that probable cause would support warrantless search of makeup case where State failed to establish exception to warrant requirement under the *Terry* rule); 79 C.J.S. Searches and Seizures § 50, p. 78 (1995) ("The existence of probable cause standing alone does not justify a warrantless search or seizure."). Even assuming *arguendo* that Sheriff Howard had probable cause[5] to search the contents of the bolt, that still did not justify the warrantless search here, absent an exception to the warrant requirement.

## IV. CONCLUSION

Without obtaining a warrant or successfully invoking a well-established exception to the warrant requirement, the police had no justification for searching the contents of Mr. Courtney's bolt. Neither the *Terry* rule nor the plain view exception justified the search. Because the trial court should have suppressed the evidence, we reverse Mr. Courtney's conviction for possession of a controlled substance under section 195.202.

ROBERT G. ULRICH, P.J., and EDWIN H. SMITH, J., concur.

---

**5.** At the suppression hearing and at trial, Sheriff Howard identified several generally suspicious facts and circumstances leading up to the opening of the bolt: 1. He could not locate Mr. Courtney on the Pierce property and believed that Mr. Courtney was hiding from him; 2. After the sheriffs left the Pierce residence, Mr. Courtney drove away; 3. Mr. Courtney was driving in the middle of the road; 4. When the officers stopped Mr. Courtney, Mr. Courtney seemed "real tired"; 5. Mr. Courtney did not act "normal" and told the officers that he had been mushroom hunting in a plowed field; 6. Mr. Courtney appeared nervous or fidgety and seemed to be moving something around underneath his leg; 7. The bolt subsequently fell from Mr. Courtney's person; and 8. The bolt was not as heavy as a normal bolt.